# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| Sheila Elder, | Case No. 1:24-cv-00649-PAB |
| Plaintiff, | |
| -vs- | |
| | JUDGE PAMELA A. BARKER |
| Ohio Department of Rehabilitation and Corrections, | |
| | MEMORANDUM OPINION & ORDER |
| Defendant. | |

Currently pending before the Court is Defendant Ohio Department of Rehabilitation and Corrections' ("ODRC") Motion for Summary Judgment (the "Motion").  (Doc. No. 31.)  Plaintiff Sheila Elder ("Elder") filed an Opposition to ODRC's Motion on August 22, 2025, to which ODRC replied on October 6, 2025.  (Doc. Nos. 33, 36.)  For the following reasons, ODRC's Motion is GRANTED.

## I.     Background

The following facts are undisputed.

### A.     Plaintiff applies for a CNP position with ODRC

Plaintiff is an African American female.  (Doc. No. 3, ¶ 8, Doc No 8, ¶ 8.) ODRC has employed Plaintiff in various positions since 1995.  (Doc. No. 3, ¶ 11, Doc No 8, ¶ 11.)  Relevant to this case, ODRC employed Plaintiff as a registered nurse starting in 2013.  (Doc. No. 3, ¶ 11, Doc No 8, ¶ 11.)  Plaintiff, along with other ODRC nurses, are bargaining unit members of the Service Employees International Union, District 1199 (the "Union").  (Doc. No. 31-5, ¶ 16.)

From June 28, 2022 through July 11, 2022, ODRC accepted applications for a correctional

nurse practitioner ("CNP") at the Mansfield Correctional Institution ("ManCi"). (Doc. No. 31-4, ¶ 10.) Plaintiff applied for this job, but the position was ultimately awarded to another individual. (Doc. No. 31-4, ¶ 12; Doc. No. 31-14.) That person declined the job, so ODRC again accepted applications for the CNP position at ManCi. (Doc. No. 31-4, ¶¶ 12–13; Doc. No. 31-14, PageID #1363.) Plaintiff then applied for the CNP position a second time. (Doc. No. 3, ¶ 12, Doc No 8, ¶ 12.)

### B.    ODRC selects a Caucasian male for the CNP position

As part of the selection process, ODRC was bound to follow the Union's Collective Bargaining Agreement. (Doc. No. 31-5, ¶ 17.) Pursuant to the CBA, applicants "must clearly demonstrate on the application how they possess the minimum qualifications for the position." (Doc. No. 31-6, PageID #1165.) The CBA further provides that "[a]ll eligible applications shall be reviewed considering the following criteria: qualifications, experience, education, active disciplinary record, and work record." (*Id.* at PageID #1166.) As part of the selection, ODRC "maintains the right to use a selection device (e.g. structured interview, written test, physical ability, etc.) to measure the listed criteria." (*Id.*) The CBA requires the job to "be awarded to the applicant with the most state seniority unless a junior employee is significantly more qualified based on the listed criteria." (*Id.*)

Consistent with the CBA, after receiving applications, a "subject matter expert" was assigned to review the applications and identify qualified candidates for an interview. (Doc. No. 31-14, PageID #1363.) After reviewing the applications, Nicole Erdos ("Erdos"), a subject matter expert, identified three individuals to interview for the CNP position. (*Id.*) These three individuals were Plaintiff, Jesse Glass ("Glass"), a white male, and Trish Koveleski, a white female. (Doc. No. 3, ¶ 15, Doc No 8, ¶ 15.)

2

All three candidates were interviewed by the same interview panel and were asked the same questions.  (Bond Dep. 17:21–18:9, 22:8–20.)  The panel consisted of John Bond ("Bond"), Angela Stuff ("Stuff"), Amy McIntosh ("McIntosh"), and Nathan Ross ("Ross").  (Bond Dep. 17:21–18:15; Doc. No. 31-2, PageID #1042; Doc. No. 31-4, ¶ 11; Doc. No. 31-11, PageID #1359; Doc. No. 31-13, PageID #1362.)  Julie Hensley ("Hensley"), a Health Care Administrator at ManCi, also sat on the panel as a non-participant.  (Doc. No. 31-12, PageID #1360.)  All members of the panel, including Hensley, are white, except for Bond, who is black.  (Bond Dep. 8:1–5, 18:12–15.)

After interviewing the three candidates, the interview panel selected Glass for the CNP position.  (Doc. No. 3, ¶ 16, Doc. No. 8, ¶16.)  In a document entitled "Recommendation for Personnel Selection" the interview panel's justification for recommending Glass was as follows:

> Jesse Glass was recommended for the position due to being a Nurse 1 for 8 years. Assist with QIC duties while at MCI and currently at ManCI.  Audit training completed at CTA in 2018, BSN obtained in 2019, Completed MSN program in July 2022.  Thoroughly educated on care across the lifespan; to include many hours of clinical rotations in primary, pediatric, and women's health care settings allowing for proper educational and experience to provide cost-effective quality healthcare.  Military and nursing work experience allowing for leadership development, and the team-care dynamic mindset needed to treat patients holistically while utilizing resources in the most effective way possible.

(Doc. No. 27-4, PageID #962.)

Each member of the interview panel, other than Bond,[1] found that Glass had a better interview than Plaintiff, and that Glass answered clinical questions better than Plaintiff did.   (Doc. No. 31-2, PageID #1042; Doc. No. 31-11, PageID #1359; Doc. No. 31-13, PageID #1362.)  McIntosh found that Glass "interviewed better than the other applicants" and that in response to a hypothetical

---

[1] Bond was the only member to find that Glass and Plaintiff both interviewed well, but he relied on the subject matter experts who "took the lead of disclosing that they felt that [Glass] was the better candidate after those interviews."  (Bond Dep. 37:22–24.)

3

question, Glass addressed an issue that Plaintiff failed to address.  (Doc. No. 31-11, PageID #1359.)

Ross found that based on Glass' "answers and conversation during the interview" he "was the most

knowledgeable candidate, as it pertains to clinical practice."  (Doc. No. 31-13, PageID #1362.)  Stuff

found that Plaintiff was "apprehensive and at times unsure of herself and her clinical decisions" in

contrast to Glass who "was confident, precise, and presented himself as the most knowledgeable."

(Doc. No. 31-2, PageID #1042.)  Further, Hensley, while not on the interview panel, found that "the

clinical responses that [Plaintiff] offered did not reflect the same level of critical thinking skills that

were apparent with both of the other candidates."  (Doc. No. 31-12, PageID #1360.)

### C.    Plaintiff files a grievance with the union

On December 21, 2022, Plaintiff filed a grievance based on her non-promotion.  (Doc. No. 3,

¶ 17, Doc No 8, ¶ 17.)  In her grievance, Plaintiff alleged that she was the most senior candidate and

that she believed that Glass was less qualified.  (Doc. No. 23-7, PageID #400.)  After a hearing,

Plaintiff's grievance was denied by Philip Rader ("Rader"), a Labor Relations Officer 3 for ODRC,

on February 9, 2023:

> This grievance is a duplicate to 06970. A Step 2 hearing was held 02/06/2023 via
> TEAMS. Present on the call were Philip Rader, LRO3; Janet Tobin, LRO2; Roy
> Steward, LRO2; Geoff Davies 1199 Organizer and the Grievant. Union Argument:
> Union argues Grievant applied for, and was not awarded the posted position of CNP
> at Mansfield Correctional Institution. Grievant/Union argue the Grievant is the
> more senior applicant by approximately 18 months and has same qualifications as
> selected candidate. Grievant/union argue management cites qualities/qualifications
> not required for position as cause for selecting candidate, however she
> possesses/demonstrates same/similar qualities/qualifications. Union argues Article
> 30.02 requires the "job shall be awarded to the applicant with the most state
> seniority unless a junior employee is significantly more qualified based on listed
> criteria." Discussion and findings: Having reviewed documents and heard related
> testimony it is the finding of the Step 2 Hearing Officer There is no dispute both
> parties met minimum qualifications of the position. Article 30.02 gives
> Management the right to "use selection devices, proficiency tests and/or
> assessments to determine if an applicant meets minimum qualifications and, if

applicable to rate applicants pursuant to this Section." Management utilized an interview and determined the selected candidate was in fact superior to the Grievant and was awarded the position. There are no contract violations, this grievance is denied at Step 2.

(Doc. No. 24-3, PageID #720.)

After her grievance was denied, on February 27, 2023, Plaintiff filed an Amended Charge of Discrimination with the EEOC.[2]  (Doc. No. 23-2, PageID #366.)  In the "discrimination based on" box, Plaintiff listed "age, race, [and] sex."  (*Id.*)  In the "the particulars are" box, Plaintiff wrote:

> I began my employment with the Respondent in or around 1995. I have been in the position of Registered Nurse since in or around July 2013. In or around 2022, I applied for a promotion to the Nurse Practitioner position. I was not hired for the position. The Respondent promoted a younger, White male who was less qualified and had less seniority than me.
>
> I believe that I was discriminated against because of my race, Black, and my sex, female, in violation of Title VII of the Civil Rights Act of 1964, as amended.
>
> I also believe that I was discriminated against because of my age, 51 (Year of Birth: 1971), in violation of the Age Discrimination in Employment Act of 1967, as amended.

(*Id.*)[3]

Thereafter, on May 25, 2023, Plaintiff, ODRC, and the Union entered into a settlement agreement.  (Doc. No. 3, ¶ 18, Doc No 8, ¶ 18; Doc. No. 23-8, PageID #402.)  Under the terms of that agreement, among other things, Plaintiff was promoted to a CNP position, received a raise, and received back pay.  (Doc. No. 23-8, PageID #402.)  Plaintiff was assigned to work at Richland Correctional Institutions ("Richland"), but she split her time between Richland and ManCi temporarily until a permanent position opened.  (*Id.*)  Plaintiff started working as a CNP at Richland

---

[2] While labeled as an "amended" charge, this is the only EEOC charge in the record.

[3] On April 10, 2024, the EEOC issued a right to sue letter to Plaintiff.  (Doc. No. 23-3, PageID #368.)

on October 23, 2023, and is currently working full time at Richland.  (Doc. No. 3, ¶ 21, Doc No 8, ¶ 21; Elder Dep. 53:12–19.)

### D.  Plaintiff reports two inmates for rules infractions

During this time, Plaintiff was threatened by inmates on two separate occasions .  Prior to filing her grievance, on November 8, 2022, Plaintiff reported an inmate for physically threatening her.  (Doc. No. 23-34, PageID #566.)  Another CNP, who is white, reported the same inmate on November 29, 2022.  (Doc. No. 23-34, PageID #564.)  Plaintiff asserts that nothing was done after she reported the inmate, but on December 8, 2022, the inmate was transferred to a different prison. (Elder Dep. 128:15–17, 131:3–12.)   In January 2023, prior to filing her EEOC charge, Plaintiff reported another  inmate who threatened to assault her.  (Doc. No. 25-1, PageID #809.)  On January 31, 2023, the  prison's Rules Infraction Board accepted Plaintiff's report as "true and factual" and the inmate received twenty-one days in restrictive housing. (Doc. No. 23-37, PageID #578.)

### E.  Plaintiff is not assigned a personal "man down radio" or a personal set of keys while splitting time between ManCi and Richland

While Plaintiff was splitting her time between ManCi and Richland, Plaintiff was never given her own "man down radio" (a distress button used to alert security of any threats) or her own set of keys while at ManCi.  While Plaintiff was not given a designated "man down radio," she had access to one by going "to the control center and [asking] for a man down [radio]."  (Elder Dep. 75:17–20.) Plaintiff also had access to a set of keys every time she went to ManCi even though she did not have her own set of keys.  (Elder Dep. 74:14:–75:4; Shelton Dep. 42:3–7.)  Plaintiff's situation at ManCi was consistent with other ODRC employees.  (Doc. No 31-4, ¶¶ 16–18.)

### F.  Plaintiff is denied overtime after starting as a CNP

After starting as a CNP at Richland, Plaintiff was denied several requests to work overtime as

a "Nurse 1" (e.g. a RN). (Elder Dep. 108:22–109:1, 109:18–110:8.) Plaintiff was denied overtime based on a directive to stop CNP's from working "Nurse 1" overtime. (Shelton Dep. 31:16–32:8, 36:11–21.) During the COVID-19 pandemic, CNPs would pick up "Nurse 1" overtime shifts. (Rader Dep. 68:10–22.) After the pandemic, ODRC pushed a directive to its institutions to cease that practice. (*Id.* at 68:23–69:1.) Notwithstanding this directive, two institutions, including ManCi, continued the practice of allowing CNPs to work Nurse 1 overtime. (*Id.* at 69:1–10, 70:1–22; Elder Dep. 112:15–23.) There is nothing in the record suggesting this practice occurred at Richland. (Shelton Dep. 35:7–12; Elder Dep. 112:15–223.)

On June 26, 2023, Plaintiff filed a grievance regarding the overtime requests, which was denied:

> A Step 2 grievance hearing was held on 07/31/2023 via TEAMS. Present on the call were: Philip Rader, LRO3; Geoff Davies 1199 organizer and the Grievant. Union argument: Union argues Grievant has been denied the opportunity to work overtime as an RN despite prior practice of permitting CNPs to do so. Union argues agency specific language (pages 240-241) is being violated. Union argues the agency practice of permitting Psych Nurses to work overtime in the Medical Department as well as permitting RNs to fill in for LPNs negates prior arguments preventing CNPs from working overtime as an RN. Union further argues the agency is mandating RNs out of order by not permitting CNPs to volunteer for overtime. Lastly, the Union argues Management is retaliating against the Grievant specifically due to a grievance she previously filed against the agency. Discussion and Findings: It is the determination of the Step 2 Hearing Officer that Management has rightfully denied Grievant (and other CNPs) from working overtime as RNs. Management asserts that by permitting CNPs to work overtime as RNs, there are potential licensing issues. Article 24.03 supports the decision to prevent CNPs from working overtime as RNs and gives Management the right to determine overtime opportunities. The article also states these opportunities are to be awarded to employees who typically perform the duties. Language cited by the Union on pages 240-241 does not apply to CNPs. The contract does not entitle one classification rights to overtime opportunities for other classifications. The Union's argument that permitting Psych Nurses the ability to work overtime in Medical Departments negates Management's argument is faulty. Psych Nurses and Medical Nurses are all RNs, and covered by the agency specific language. The argument that RNs doing LPN duties is also faulty as RNs and LPNs have overlapping duties and work in

the same departments. Lastly, OSC's message for many years has been that CNPs should not work overtime as RNs. There were exceptions made as institutions experienced Covid-19 breakouts, but permitting CNPs to work overtime was to have been stopped in late 2021. OSC learned some institutions were still engaged in the practice and re-issued work direction to the institutions to assure all parties were clear of expectations. While this did coincide with the Grievant's settlement it was not done preclude (sic) only (sic) the Grievant from working overtime, the timing was purely coincidental. There are no contract violations, this grievance is denied at Step 2.

(Doc. No. 24-8, PageID #729–30.)

Plaintiff's grievance then proceeded to an arbitration, which concluded on July 22, 2024.

(Doc. No. 23-13, PageID #411.)  The arbitrator found, in relevant part,

The Union argues that using NPs for Nurse 1 overtime is a past practice that has been going on for over four years and occurred as recently as eighteen (18) days prior to the hearing when NP Slone worked overtime. As stated in Elkouri & Elkouri, How Arbitration Works, "In the absence of a written agreement, 'past practice' to be binding on both Parties, must be (1) unequivocal; (2) clearly enunciated and acted upon; (3) readily ascertainable over a period of time as a fixed, and established practice accepted by both Parties." (Alan Miles Ruben ed., 6th ed. 2003, pp. 607-608) The Union cites that NP Slone, NP Glass, and NP Newland have worked RN overtime. The Employer concedes that NPs were used in 2020 through 2022 during the pandemic but that was out of necessity to maintain it facilities during a force majeure that affected every institution across the nation. After 2022, documentation shows only the aforementioned three NPs worked overtime as Nurse 1s. The ODRC has twenty-five (25) institutions across the state and employs approximately seventy-five (75) CNPs. The three named NPs worked at two different institutions from the location where the grievance arose and did so without agency permission. Thus, there does not seem to be an established past practice.

\* \* \*

The CBA neither explicitly includes nor excludes NPs from the rotating volunteer overtime roster for Nurse 1s. The language as such suggests that any qualified employee can sign up for overtime. Both Management and the Union cite contract language, specifically Section 24.03, that consistently states that all volunteers must be qualified. Thus, this Arbitrator has determined that the Union has met their burden of proof, and the grievance is sustained. The remedy will be that going forward, the Grievant will be able to volunteer for Nurse 1 overtime, and the overtime will be assigned in accordance with pages 241 through 242 of the CBA.

8

> No compensation will be granted since the CBA, in "Missed Overtime Opportunities" on page 242, states that employees who missed an overtime opportunity will be permitted to work the number of hours missed at the date and shift of their choosing but receive no other monetary or compensatory time award. The Union, however, never identified which dates or specific missed overtimes were being grieved. After a review of sign-up sheets (Joint Exhibit #18) the Employer did identify seven (7) possible missed opportunities. The opportunities were missed because the language was interpreted differently in different institutions and by different people. Overtime is not a guaranteed benefit. Since the Grievant was not harmed and the interpretation of the language was questionable, no makeup opportunities will be afforded to the Grievant. It is suggested that moving forward, this issue be specifically addressed in bargaining to further clarify the intent of both Parties.

(Doc. No. 23-13, PageID #419–22.)

After the arbitration award, ODRC again denied Plaintiff's overtime requests, resulting in Plaintiff filing a second grievance. (Elder Dep. 193:7–194:13.) Plaintiff and ODRC were able to resolve that grievance and entered into a settlement agreement on October 8, 2024. (*Id.*; Doc. No. 23-21, PageID #450.) Pursuant to the terms of that settlement agreement, Plaintiff was awarded five (5) eight (8) hour shifts of overtime. (Doc. No. 23-21, PageID #450.)

### G.    The Hurt Feelings Report

In September 2023, after the union denied the first overtime grievance, Plaintiff found a "hurt feelings report" near her locker in the employee lunchroom at ManCi. (Elder Dep. 154:7–155:6.) The "hurt feelings report" reads, in relevant part,

> We, as the Dept, take hurt feelings seriously. If you don't have someone who can give you a hug and make things all better, please let us know and we will promptly dispatch a "hugger" to you ASAP. In the event a "hugger" cannot be found, an EMS Team will be dispatched to soak your socks in coal oil to prevent ants from crawling up your leg and eating their way up your candy ass. If you are in need of supplemental support, upon written request, we will make every reasonable effort to provide you with a "blankie", a "binky" and/or a bottle if you so desire.

(Doc. No. 25-3, PageID #819.)

Plaintiff believes that it was directed at her because she "went to the supervisor on somebody" based on another employee who was not "trying to work with" her, and she found the "hurt feelings report" shortly after complaining to her supervisor.  (Elder Dep. 156:22–157:10.)  Plaintiff does not know who put the "hurt feelings report" near her locker, but she claims that a corrections officer told her that "they say [a RN] put it there."  (*Id.* at 165:1.)

Plaintiff's supervisor, Shawn Shelton ("Shelton"), testified that "hurt feelings reports" are "a joke."  (Shelton Dep. 38:1–2.)  Glass also testified that a "hurt feelings report" reflects the "kind of the sense of humor we have in corrections."  (Glass Dep. 38:15–22.)

Plaintiff did not think the "hurt feelings report" was a joke.  After receiving the "hurt feelings report,"  Plaintiff emailed Shannon Olds, another ODRC employee, informing her that she received the report.  (Doc. No. 23-33, PageID #555–56.)  Ms. Olds responded that

> I have read your complaint and appreciate your vulnerability in disclosing your concerns. I will arrange to meet with you tomorrow to discuss since I was out of the institution most of today.
>
> There is no need to fear any retribution due to reporting information.

(Doc. No. 23-33, PageID #555.)  ODRC ultimately "changed up the nursing staff and had a different person" help Plaintiff going forward.  (Elder Dep. 157:22–158:2.)

## II.  Procedural History

On April 11, 2024, Plaintiff initiated this civil action against ODRC by filing her Complaint. (Doc. No. 1.)  On April 17, 2024, Plaintiff filed her First Amended Complaint.  (Doc. No. 3.)  Therein, Plaintiff raises three claims for relief:  (1) Sex Discrimination in Violation of Title VII; (2) Race Discrimination in Violation of Title VII; and (3) Retaliation in Violation of Title VII.  (*Id.*)

On June 20, 2025, ODRC filed its Motion for Summary Judgment.  (Doc. No. 31.)  Plaintiff

filed her Opposition to ODRC's Motion on August 22, 2025, to which ODRC replied on October 6, 2025.  (Doc. Nos. 33, 36.)  Accordingly, ODRC's Motion is ripe for review.

### III.    Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party."  *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006).  "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'"  *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law."  *Henderson*, 469 F.3d at 487.  At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party."  *Pittman v. Experian Info. Solutions, Inc.*, 901 F.3d 619, 628 (6th Cir. 2018).  In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact."  *Ask Chems., LP v. Comput. Packages, Inc.*, 593 F. App'x 506, 508 (6th Cir. 2014).  The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact."  *Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 764 (6th Cir. 2008).  "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'"  *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems.*, 593 F. App'x at 508–09. "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'" *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F.Supp.3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

## IV.    Analysis

### A.    ODRC is entitled to summary judgment on Plaintiff's retaliation claim

In its Motion, ODRC argues that Plaintiff failed to exhaust her administrative remedies with respect to her retaliation claim.  (Doc. No. 31, PageID #1027–28.)  ODRC asserts that "Plaintiff neither checked the 'retaliation' box in her charge nor included any facts in her charge that would indicate that she was bringing a charge based on retaliation." (Doc. No. 31, PageID #1028.)  Instead, ODRC claims, "her charge was limited solely to age, race, and sex discrimination." (*Id.*)

In her Opposition, Plaintiff argues that "ODRC was properly on notice of [Plaintiff's] retaliation claims because her retaliation claims reasonably grew out of the conduct she detailed in her EEOC charge."  (Doc. No. 33, PageID #1382.)  Plaintiff also asserts that she "filed her EEOC charge pro se" and that "ODRC acknowledged her retaliation claims after [she] informed ODRC she received the Hurt Feelings Report."  (*Id.*)

In its Reply, ODRC argues that "a retaliation claim does not automatically flow from a discrimination claim in a charge."  (Doc. No. 36, PageID #1410.)  ORDC asserts that "Plaintiff only mentions that she was discriminated against as to her denial of the CNP position," that she "does not mention denial of OT . . . [the] man down radio, or . . . anything about the investigation into her conduct reports."  (*Id.*)  Thus, according to ODRC, "Plaintiff failed to even at a minimum, allege

12

facts in her charge that would expand the scope of the EEOC's investigation."  (*Id.*)  ODRC further argues that "the fact that Plaintiff filed her charge pro se does not save her retaliation claim from dismissal for failure to exhaust."  (*Id.*)  ODRC finally argues, without citation, that "any internal complaint filed at any point during employment does not put the EEOC on notice that it is part of the charge."  (*Id.* at PageID #1411.)

Generally, the failure to include a claim in a EEOC charge bars a plaintiff from bringing that claim in court.  *See*, *e.g.*, *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361–62 (6th Cir. 2010).  "The purpose of the requirement is to trigger an investigation, which gives notice to the alleged wrongdoer of its potential liability and enables the EEOC to initiate conciliation procedures in an attempt to avoid litigation."  *Dixon v. Ashcroft*, 392 F.3d 212, 217 (6th Cir. 2004) (citing *Davis v. Sodexho, Cumberland College Cafeteria*, 157 F.3d 460, 463 (6th Cir. 1998)).  Failing to state the correct legal claim or conclusions in an EEOC complaint is not dispositive, however.  Instead, in this Circuit, a plaintiff can exhaust her administrative remedies if "the claim can be reasonably expected to grow out of the EEOC charge."  *Weigel v. Babtist Hosp.*, 302 F.3d 367, 367 (6th Cir. 2002) (quoting *Strouss v. Mich. Dep't of Corr.*, 250 F.3d 336, 342 (6th Cir. 2001)).  Accordingly, a claim is preserved if the facts set forth in the EEOC charge "would prompt the EEOC to investigate a different, uncharged claim."  *Pemberton v. Bell's Brewery, Inc.*, 150 F.4th 751, 761 (6th Cir. 2025) (quoting *Younis*, 610 F.3d at 362).  In answering this question, the Sixth Circuit has instructed that "*pro se* complaints are construed liberally."  *Id.*

The Court finds ODRC's citation to *Younis* dispositive.  In *Younis*, the Sixth Circuit affirmed summary judgment in the employer's favor on the plaintiff's retaliation claim for failure to exhaust his administrative remedies.  *Younis*, 610 F.3d at 362–63.  The plaintiff's *pro se* EEOC charge

13

provided in relevant part:

> I was subjected to two proficiency checks, around the last week of August 2005; and, I was advised that I had failed both checks. Ultimately, I was discharged for an alleged inability to pass Proficiency Checks.

> I believe that I have been discriminated against because of my religion (Muslim) and National Origin (Arab) in violation of Title Vii of the Civil Rights Act of 1964, as amended.

*Younis v. Pinnacle Airlines, Inc.*, No. 07-02356, 2008 U.S. Dist. LEXIS 146236, at *13 (W.D. Tenn. Aug. 14, 2008).  The Sixth Circuit found that "there is nothing in the narrative portion of the EEOC charge that could be interpreted as claiming retaliation, nor is there any language that would have put the EEOC or the employer on notice that [plaintiff] was alleging retaliation by [the employer]." *Younis*, 610 F.3d at 363.  It further found that  "[t]he EEOC form included a specific check-off box to indicate a charge of retaliation," and while the plaintiff "marked other boxes on the form evincing an intent to charge discrimination based on religion and national origin, he did not indicate that he was alleging retaliation." *Id.* at 363.  Based on those facts, and in the context of evaluating the plaintiff's *pro se* EEOC charge, the Court concluded that the plaintiff had failed to exhaust his administrative remedies.

*Younis* compels a finding that Plaintiff failed to exhaust her administrative remedies.  Like the plaintiff in *Younis*, Plaintiff did not check the "retaliation" box on her *pro se* EEOC charge and listed or indicated that the discrimination was based on "Age, Race, [and] Sex."  (Doc. No. 23-2, PageID #366.)  Further, the narrative portion of the EEOC charge is substantially the same as the charge at issue in *Younis*:

> I began my employment with the Respondent in or around 1995. I have been in the position of Registered Nurse since in or around July 2013. In or around 2022, I applied for a promotion to the Nurse Practitioner position. I was not hired for the position. The Respondent promoted a younger, White male who was less qualified

14

and had less seniority than me.

I believe that I was discriminated against because of my race, Black, and my sex, female, in violation of Title VII of the Civil Rights Act of 1964, as amended.

I also believe that I was discriminated against because of my age, 51 (Year of Birth: 1971), in violation of the Age Discrimination in Employment Act of 1967, as amended.

(*Id.*)[4]  There is no explicit mention of retaliation, and the Court finds that "there is nothing in the narrative portion of the EEOC charge that could be interpreted as claiming retaliation, nor is there any language that would have put the EEOC or the employer on notice that [Plaintiff] was alleging retaliation by [ODRC]."  *Younis*, 610 F.3d at 363.

Therefore, under *Younis*, ODRC is entitled to summary judgment on Plaintiff's retaliation claim because Plaintiff failed to exhaust her administrative remedies.  *See also Davis v. Univ. of Toledo*, No. 25-3296, 2026 U.S. App. LEXIS 1633, at *20 (6th Cir. Jan. 22, 2026) (affirming summary judgment in favor of employer on plaintiff's retaliation claim because "while the charges put the OCRC on notice of potential discrimination against Davis, they didn't provide notice of retaliation"); *Woodling v. GeoBuild, LLC*, No. 22-3499, 2023 U.S. App. LEXIS 1575, at *6–7 (6th Cir. Jan. 20, 2023) (affirming dismissal of retaliation claim because the Plaintiff "failed to check the box labelled 'RETALIATION', and there is nothing in the description of his charge that even hinted at this claim"); *Handlon v. Rite Aid Servs., LLC*, 513 F. App'x 523, 528 (6th Cir. 2013) (holding that

---

[4]  The Court notes that the only EEOC charge in the record is attached to Plaintiff's deposition transcript as Exhibit 2. Plaintiff testified in her deposition that Exhibit 2 was "the charge I filed when I initially wrote the complaint in there. It was amended with the retaliation inside of there as well."  (Elder Dep. 44:17–19.)  The Court finds, however, that there is no amended charge in the record, and Plaintiff has not produced one with her Opposition.  Because ODRC met its burden by pointing the Court to the EEOC charge *in the record*, Plaintiff's burden is to "produce evidence that results in a conflict of material fact to be solved by a jury."  *Cox*, 53 F.3d at 150.  Because Plaintiff has not produced any amended charges, the Court's review is limited to the EEOC charge attached to Plaintiff's deposition transcript.  *See Jones v. Option One Mortg. Corp.*, 466 F. App'x 449, 454 (6th Cir. 2012) (rejecting nonmoving party's argument concerning evidence that "was never actually put before the district court").

"[s]ummary judgment was also proper with respect to Handlon's retaliation claims under Title VII

and ELCRA" because "Handlon did not mention retaliation in her EEOC charge, nor did she ever

amend the charge to include this claim").

Plaintiff's argument that "ODRC acknowledged her retaliation claims after Elder informed

ODRC she received the Hurt Feelings Report" does not save the day for her. (Doc. No. 33, PageID

#1382.) Plaintiff points the Court to a September 12, 2023 or post-EEOC-charge email that she sent

to Shannon Olds. In that email, Plaintiff writes, among other things, that she received the Hurt

Feelings Report "after [she] complained to the HCA." (Doc. No. 23-33, PageID #556.) Ms. Olds

responded:

> I have read your complaint and appreciate your vulnerability in disclosing your
> concerns. I will arrange to meet with you tomorrow to discuss since I was out of
> the institution most of today.
>
> There is no need to fear any retribution due to reporting information.

(*Id.* at PageID #555.)

Plaintiff does not offer any authority for her proposition that this email serves to excuse her

from exhausting her administrative remedies.[5] And the Court could find none. As explained by the

Sixth Circuit, the purpose of the exhaustion requirement is twofold: "it gives the employer

information regarding the employee's complaint, and it provides both the EEOC and the employer

an opportunity to attempt reconciliation." *Santiago v. Meyer Tool Inc.*, No. 22-3800, 2023 U.S. App.

LEXIS 14469, at *27 (6th Cir. June 8, 2023) (citing *Younis*, 610 F.3d at 361–62). "Hence, allowing

a Title VII action to encompass claims outside the reach of the EEOC charges would deprive the

---

[5] And ODRC does not offer any competing authority. It argues, without citation, that "[t]he test is not whether the
employer could guess what claims the charging party is attempting to bring based on any internal complaint filed during
employment or events that allegedly occurred during employment." (Doc. No. 36, PageID #1411.)

16

charged party of notice and would frustrate the EEOC's investigatory and conciliatory role." *Younis*, 610 F.3d at 362.  Thus, merely putting an employer on notice, and not the EEOC, would make the exhaustion requirement meaningless.

For all these reasons, the Court finds that ODRC is entitled to summary judgment on Plaintiff's retaliation claim.

**B.    ODRC is entitled to summary judgment on Plaintiff's discrimination claims**

Plaintiff's remaining claims are based on ODRC initially denying her promotion and denying her overtime.[6]  (Doc. No 3, ¶¶ 31, 37.)  The Court addresses each in turn below.

**1.    ODRC did not discriminate against Plaintiff when it promoted Glass over her**

In its Motion, ODRC does not dispute that Plaintiff can maintain a prima facie case for failure to promote.  (Doc. No. 31, PageID #1028.)  Instead, it asserts that the reason why it promoted Glass was based on legitimate nondiscriminatory reasons, and that Plaintiff cannot demonstrate that those reasons were pretext.  (*Id.* at PageID #1028–29.)  As to the former, ODRC argues that it "selected Glass for the Mansfield CNP position because his responses to the interview questions were clinically stronger and more responsive than Plaintiff's responses and emphasized a collaborative approach to focused care." (*Id.* at PageID #1028.)  As to pretext, ODRC argues that "Plaintiff cannot demonstrate

---

[6] ODRC makes several arguments in its Motion that the Court declines to consider.  Specifically, ODRC argues that "Plaintiff also alleges both discrimination and retaliation because she was not provided with her own set of keys and man-down radio when she was promoted to the CNP position, was allegedly not trained, and that Defendant failed to investigate her incident or conduct reports." (Doc. No. 31, PageID #1032.)  The Court disagrees.  Plaintiff does not allege in the First Amended Complaint that these acts constitute discrimination.  Her discrimination claims are limited to ODRC denying her "a promotion and overtime for pre-textual reasons." (Doc. No. 3, ¶¶ 31, 37.)  By contrast, she alleges in her retaliation claim that "Defendant failed to investigate or remedy Plaintiff's reports of at least one inmate's threatening and taunting behavior" and that she was "treated differently than her Caucasian and/or male colleagues." (*Id.* at ¶¶ 40–41.)  Because Plaintiffs' discrimination claims are limited to the promotion and overtime, any discrimination claim related to training, the man down radio or the keys is not properly before the Court.  *Otis v. Metro. Gov't of Nashville & Davidson Cty.*, No. 3:15-cv-01512, 2017 U.S. Dist. LEXIS 171698, at *15, n.3 (M.D. Tenn. Oct. 17, 2017) ("Additionally, Metro moves for summary judgment on Otis' ADA and ADEA harassment claims, to the extent she brings them . . . Those claims are not in the Complaint, and therefore Otis did not properly bring either claim").

pretext under any pretext avenue because she lacks evidence that Defendant promoted Glass over her for any illegal reason." (*Id.* at PageID #1030.)  It asserts that "Defendant honestly believed that Glass was a better candidate because of his superior performance in the interview, especially given that Plaintiff failed to properly diagnose the hypothetical patients during her interview." (*Id.*)

In her Opposition, Plaintiff does not dispute that Defendant set forth evidence of a legitimate nondiscriminatory reason for promoting Glass.  Instead, Plaintiff limits her argument to pretext. Plaintiff argues that "a cursory review of the ODRC's reasons for promoting Glass compared to both Glass' and Elder's qualifications easily establish that Elder was more qualified." (Doc. No. 33, PageID #1384.)  She asserts that "[a]ccording to Rader, Glass's experience was not demonstrably superior to Elder." (*Id.*)  Plaintiff argues that ODRC could not have "honestly believed Glass was more qualified" because "ODRC turned a blind eye to qualifications and its own policies to hire a white male over Elder, a black female." (*Id.*)  Plaintiff also points out that there was a scoring discrepancy between the job postings because Erdos scored her "four points lower on the second application" but Plaintiff submitted the "same information" with both applications.  . (*Id.*)  Plaintiff asserts, without citation to the record, that "Had Erdos scored Elder an 11 on the September application, Elder would have immediately been selected for the job." (*Id.* at PageID #1385.)  Finally, Plaintiff asserts that Hensley, as Glass's supervisor, "requested to have the position reposted just after Glass obtained his Nurse Practitioner's license." (*Id.*)

In its Reply, ODRC argues that "Plaintiff has misrepresented Erdos's role in the hiring process" because  "Erdos only screens applicants as a subject matter expert and scores them based on what is on the application to determine who will receive an interview, not who will receive the position." (Doc. No. 36, PageID #1412.)  ODRC asserts that "Plaintiff ignores the fact Erdos, the

subject matter expert, does not know the race or sex of the applications while scoring the applications and is not on the interview panel and has no decision in who is selected for the position." (*Id.*)  ODRC further argues that Plaintiff's "argument that she should have received the position based on this score alone is incorrect and not supported by the record." (*Id.*) ODRC next argues that "Rader was not part of the interview panel" and that "[h]is opinion as to who was more qualified is irrelevant as to what the interview panel honestly believed." (*Id.*)  ODRC further argues that "Plaintiff has provided no evidence that the members of the interview panel did not honestly believe that Glass was more qualified." (*Id.* at PageID #1413.)  ODRC finally argues that "Hensley was never deposed and she states in her affidavit why she thought Glass was more qualified for the position" and that "[a]nything outside of her affidavit is conjecture."  (Doc. No. 36, PageID #1414.)

Because Plaintiff has not pointed the court to any direct evidence of discrimination, the *McDonnell Douglas* burden-shifting framework governs her failure to promote claims.   Under that framework:

> a plaintiff must first establish a *prima facie* case of disparate treatment.  [I]f the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection.  [S]hould the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*LeVine v. Dejoy*, 64 F.4th 789, 797 (6th Cir. 2023) (internal citations and quotations omitted).  Based on the parties briefing, ODRC does not dispute that Plaintiff can prove her prima facie case, and Plaintiff does not dispute that ODRC has carried its burden to articulate some legitimate, nondiscriminatory reason for why it promoted Glass over Plaintiff.   Therefore, the Court's analysis, at this stage, is to determine whether Plaintiff presented evidence of pretext that would create a

genuine dispute of material fact for trial.

"Plaintiffs ordinarily show pretext 'by showing that the proffered reason[] had no basis in fact; (2) was insufficient motivation for the employment action; or (3) did not actually motivate the adverse employment action." *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 515 (6th Cir. 2021) (quoting *Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 790–91 (6th Cir. 2006)). "This burden is not heavy, though, as summary judgment is warranted only if no reasonable juror could conclude that the employer's offered reason was pretextual." *George v. Youngstown State Univ.*, 966 F.3d 446, 462 (6th Cir. 2020) (citing *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 620 (6th Cir. 2006); *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 547–48 (6th Cir. 2004)).

When a plaintiff bases pretext on qualifications evidence, "'the evidence must be of sufficient significance itself to call into question the honesty of the employer's explanation' for its hiring decision." *LeVine*, 64 F.4th at 798 (quoting *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 627 (6th Cir. 2006)). And while the Sixth Circuit recognizes that employers "are generally free to choose among qualified candidates," the Sixth Circuit has instructed district courts to consider the following when ruling on a motion for summary judgment:

> [i]f a factfinder can conclude that a reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate—something employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture.

*Id.* (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008)).

"To that end, comparative qualifications 'may be probative of whether the employer's reasons are pretexts for discrimination.'" *Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 259 (1981)). "Relative qualifications establish triable issues of fact as to pretext where the evidence

20

shows that either (1) the plaintiff was a plainly superior candidate, such that no reasonable employer would have chosen the latter applicant over the former, or (2) plaintiff was as qualified if not better qualified than the successful applicant, and the record contains other probative evidence of discrimination." *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 815 (6th Cir. 2011) (cleaned up).

Plaintiff never once argues that she was "plainly superior" to Glass. Plaintiff's argument is based primarily upon the language of the CBA. Under the CBA, "[a]mong those that are qualified[,] the job shall be awarded to the applicant with the most state seniority unless a junior employee is significantly more qualified based on the listed criteria." (Doc. No. 23-32, PageID #542.) Plaintiff does not assert that Glass was not qualified for the CNP position. (Doc. No. 33, PageID #1373–74 ("Elder met the minimum qualifications and was awarded an interview along with two other candidates that also scored a 7, Jesse Glass and Trish Kovaleski"). Instead, Plaintiff's position is that she was "more qualified" and thus Glass' experience "was not demonstrably superior to Elder's" to be selected for the position." (Doc. No. 33, PageID #1376.)

Indeed, the record does not support a finding that Plaintiff was a "plainly superior candidate." The record certainly shows that Elder had more experience than Glass. Elder received her registered nurse license in 2009, while Glass received his in 2014. (Glass Dep. 11:14–17; Elder Dep. 15:1–5.) But they have comparable experience working at ODRC. Plaintiff began working as a nurse for ODRC in 2013 and Glass began working as a nurse for ODRC in 2014. (Glass Dep. 9:6–15; Elder Dep. 24:21–25:1.) Further, Plaintiff and Glass have the same level of education (*e.g.* Master of Science of Nursing). (Glass Dep. 9:19–10:1; Elder Dep. 14:17–15:11.) And they had a similar level of training. (Bond Dep. 29:21–30:4.)

Bond, the only member of the hiring panel deposed, testified that "they were more equal"

based on their employment applications and interviews.  (*Id.* at 38:12–19.)  The other members of the interview panel submitted affidavits where they all aver that Glass had a better interview than Elder and that Glass answered clinical questions better than Elder.  (Doc. No. 31-2, PageID #1042; Doc. No. 31-11, PageID #1359; Doc. No. 31-13, PageID #1362.)  Based on the record, the Court cannot say that Elder was "plainly superior" to Glass.  The only qualification that Elder had over Glass was experience and seniority.  This alone, however, is not enough to establish that she was "plainly superior."  *See Valdez v. Fed. Express Corp.*, No. 2:22-cv-02267-TLP-cgc, 2025 U.S. Dist. LEXIS 269082, at *22 (W.D. Tenn. Jan. 6, 2025) (finding that a plaintiff having "notably more flight hours than the selected captain" standing alone did "not show that he was the plainly superior candidate"); *Taylor v. Ingham Cnty. 30th Jud. Cir. Ct.*, No. 1:20-cv-1043, 2023 U.S. Dist. LEXIS 232183, at *24 (W.D. Mich. Mar. 24, 2023) (holding the plaintiff "cannot demonstrate a triable issue that she was the plainly superior candidate" based on seniority alone).

Having found that Plaintiff was not the "plainly superior candidate," Plaintiff's promotion claim fails at this stage unless she has presented "other probative evidence of discrimination." *Vizcarrondo v. Ohio Dep't of Rehab. & Corr.*, No. 1:18-CV-01255, 2019 U.S. Dist. LEXIS 203181, at *41 (N.D. Ohio Nov. 22, 2019) (Barker, J.).  The Court finds that she has not.

Plaintiff points to three facts establishing pretext.  First, Plaintiff asserts that "[a]ccording to Rader, Glass's experience was not demonstrably superior to Elder."  (Doc. No. 33, PageID #1384.)  According to Plaintiff, "Rader immediately spotted a 'glaring issue' because the interview panel failed to hire the most senior applicant pursuant to the CBA."  (*Id.*)  Plaintiff misstates Rader's testimony.  Rader did not testify that "the interview panel failed to hire the most senior applicant pursuant to the CBA" as Plaintiff suggests.  (*Id.*)  In his deposition, Rader testified as follows:

Q:  Okay. And then you made a determination that there was no contract violations; right?

A. Yes, but no.

Q. Okay.

A. So I -- I saw some issues with the case when I reviewed the packet.

Q. All right.

A. I made recommendations to the administration. I made observations to the administration. And this is -- this is an example that I mentioned earlier in which the one side or the other is unwilling or unable to come to resolution. So this is a situation where I made observations and I had concerns about the packet, but I was not in a position to settle the case, so I had to deny it at the Step 2 hearing.

Q. Okay. I'm going to take this down, because it's a little distracting right now. Let's talk about the observations that you made. So what observations specifically did you make that you found -- that you felt were problematic?

A. Yeah. So first and foremost, the glaring issue for me was that Jesse Glass was a less senior employee. The contract language affords management the ability to select a less senior employee if that less senior employee is demonstrably superior. I think it's demonstrably superior. I did not feel as though Mr. Glass on paper was demonstrably superior, and I did not think that I would be able to adequately defend management's assertion that he was demonstrably superior.

Q. Okay. So when you made that conclusion, what did you do?

A. I worked with the local labor officer, a young lady by the name of Janet Tobin, that we should all be super jealous of, because she's retired now, and made my observations known to her and asked her to speak to the decision makers. Because at that point, I didn't know who the decision makers were. Please understand, some institutions, the warden makes all the decisions when it comes to some of these selections. Other institutions, they let deputies or department heads make the final decision. So in this particular case, I wasn't sure if it was the warden or if it was the HCA, healthcare administrator, excuse me, or if it was a deputy. And I asked Janet to have a conversation with some people about how and why we arrived at that. And this is one of those situations where I -- I trusted the local labor officer to help carry the message.

* * *

23

Q:  Okay, thank you.  All right. So basically, from your perspective, Janet went and talked to the decision maker and then relayed that information back to you; right?

A. Yes.

Q. What information did Janet relay to you?

A. That they were going to stick with Jesse.

(Rader Dep. 40:22–43:8, 43:24–44:9.)  While Rader certainly felt that Glass was not superior "on paper," he ultimately denied Plaintiff's grievance.  (Doc. No. 24-3, PageID #720.)  In his decision, Rader concluded in relevant part:

> Discussion and findings: Having reviewed documents and heard related testimony it is the finding of the Step 2 Hearing Officer There is no dispute both parties met minimum qualifications of the position. Article 30.02 gives Management the right to "use selection devices, proficiency tests and/or assessments to determine if an applicant meets minimum qualifications and, if applicable to rate applicants pursuant to this Section." ***Management utilized an interview and determined the selected candidate was in fact superior to the Grievant and was awarded the position. There are no contract violations, this grievance is denied at Step 2***.

(*Id.* at PageID #720 (emphasis added).)  Having found that "there are no contract violations," Rader implicitly concluded that Glass was "significantly more qualified" for purposes of the CBA based upon Glass' performance during his interview.

Second, Plaintiff  correctly points out that "Erdos scored [Plaintiff] four points lower on the second application."  But the undisputed evidence in the record shows that Erdos was unaware of Plaintiff's race and gender when scoring Plaintiff's applications.  Bond avers in his affidavit:

> During screening, Defendant's assigned Subject Matter Expert reviews each applicant's application of the presences of requisite minimum qualifications, which generally includes certain educational and experience requirements in addition to specific job-related certifications and licensures.  The application does not indicate the race, sex or other protected class of the application.

(Doc. No. 31-4, ¶ 9.)  Upon review of Plaintiff's applications, neither mention her race or gender.

24

(Doc. No. 23–15; Doc. No. 23-17.) Erdos also avers in her affidavit that she "did not witness the use of race, sex, or age as a criterion for selection of the position during my interaction with the process." (Doc. No. 31-14, PageID #1363.) Plaintiff has not presented any evidence that Erdos was even aware of Plaintiff's race or gender while completing her evaluation or that Erdos's scoring discrepancy was motivated by some improper purpose.

Furthermore, even assuming for the sake of argument that the evidence did show Erdos was aware of Plaintiff's race or gender, the scoring discrepancy does not show pretext. Plaintiff, without citation to anything in the record, asserts that "[h]ad Erdos scored Elder an 11 on the September application, Elder would have immediately been selected for the job." (Doc. No. 33, PageID #1385.) Upon review of the record, Plaintiff is incorrect. Nothing in the CBA would require ODRC to select Plaintiff based on Erdos' scores alone. ODRC's "Procedures for Recruitment, Review and Selection of Applicants" likewise do not have such a requirement. (Doc. No. 24-2.) Put simply, there is nothing in the record to suggest that had Erdos scored Plaintiff consistently between the applications that she would have immediately gotten the promotion or that Glass would not have received an interview.[7]

Third, Plaintiff asserts that (1) "Glass testified that he was referred to apply for the September CNP position by an employee and spoke with Hensley about the position;" (2) "Hensley requested to

---

[7] Indeed under "Procedures for Recruitment, Review and Selection of Applicant," Plaintiff and Glass could still have received an interview even if Erdos scored Plaintiff's applications in the same manner. The Procedures provide that interviews will be scheduled "[a]fter the applicant pool/schedule interview list is determined." (Doc. No. 24-2, PageID #714.) To determine the applicant pool, the subject matter expert "shall review each application and place in the proceed or not proceed pile." (*Id.* at PageID #715) "The criteria for the proceed pile shall be the absolute minimal experience an applicant has to receive further consideration." (*Id.*) "Once the proceed pile is determined, the SME shall begin completing the SME Application Review document on each applicant." (*Id.*) After completing the applications, the SME has the option to "[i]nterview all applicants in the proceed pile" or "[c]omplete the SME Application Review document on each applicant in the proceed pile" and indicate whether to schedule an interview for each applicant. (*Id.* at PageID #715–16.) Thus, even if Erdos scored Plaintiff consistently between the two applications, ODRC could still have interviewed Glass under the "Procedures for Recruitment, Review and Selection of Applicant."

have the position reposted just after Glass obtained his Nurse Practitioner's license;" (3) Hensley was "Glass's supervisor at the time he applied for the CNP position" so she "was aware Glass wanted to apply;" and (4) "[w]hile Hensley purports she was a 'non-participant' in the hiring panel for the September position, her affidavit states she participated in panel discussions and gave her opinion about the applicants, specifically Glass." (Doc. No 33, PageID #1385.) These facts, according to Plaintiff, amount to pretext.

The Court disagrees. Plaintiff seems to be arguing that if a supervisor helps another employee apply for a promotion, that must suggest that there was discriminatory animus towards another employee who did not get the promotion. Plaintiff offers no authority for why this amounts to pretext and she has not cited to any portion of the record to support her assertions. "[M]ere personal beliefs, conjecture and speculation are insufficient to support an inference of [] discrimination." *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 724 (6th Cir. 2006) (quoting *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 247 (6th Cir. 1997)). There is simply nothing in the record to suggest that Hensley's role in the hiring process amounted to pretext. *See Kuklinski v. Mnuchin*, 829 F. App'x 78, 84 (6th Cir. 2020) ("Kuklinski does not explain how these facts, or conjectures, demonstrate pretext nor does he provide caselaw supporting that conclusion"); *Harris v. City of Akron*, 836 F. App'x 415, 421 (6th Cir. 2020) ("A court may not reject an employer's explanation of its action unless there is sufficient basis *in the evidence* for doing so") (emphasis in original).

In sum, the Court finds that Plaintiff has not presented any probative evidence of discrimination to establish pretext. The Court therefore finds that ODRC is entitled to summary judgment on Plaintiff's failure to hire claims because no reasonable juror could conclude that the

26

ODRC's offered reason was pretextual.[8]

### 2.    ODRC did not discriminate against Plaintiff when it denies her overtime requests

In its Motion, ODRC argues that "Plaintiff cannot demonstrate the fourth element of her prima facie case as it relates to the denial of Nurse 1 overtime while she was employed as a CNP because she cannot establish that she was treated differently than similarly-situated employees."  (Doc. No. 31, PageID #1030.)  It asserts that after the COVID-19 pandemic, "a directive was issued that no CNP employees were permitted to work Nurse 1 overtime." (*Id.* at PageID #1031.)  ODRC concludes that "[b]ecause the directive was for all employees, regardless of race or sex, Plaintiff cannot demonstrate a claim of discrimination based on her denial of overtime." (*Id.*)  ODRC further argues that it has "a legitimate nondiscriminatory, nonretaliatory reason for its denial of overtime" because "it honestly believed that both the directive issued and the Agreement prevented Plaintiff from working Nurse 1 overtime while employed as a CNP."  (Doc. No. 31, PageID #1032.)  ODRC then argues that "Plaintiff cannot demonstrate that these reasons are pretextual given that she was never given another reason for the denial of overtime and there is no evidence that she was denied this overtime for illegal reasons." (*Id.*)  It asserts that "[a]lthough Plaintiff eventually filed a grievance related to the overtime and the arbitrator found in her favor, the arguments made at the arbitration by the Defendant support the fact that it honestly believed Plaintiff could not work overtime as a Nurse

---

[8] Having found that Plaintiff has not presented any evidence of pretext, the Court need not address ODRC's argument that Plaintiff's failure to hire claims fail under the "honest belief" rule. *Briggs*, 11 F.4th at 515 ("Under the honest belief rule, a pretext argument falling into the first category—asserting that the reason given by the employer has no basis in fact—may be defeated by conclusive evidence that the defendant honestly believed its proffered reason, and that the belief was reasonably based on particularized facts that were before it at the time the decision was made) (quotations omitted).  And even if the Court were to analyze ODRC's argument, it is skeptical the honest belief rule has any applicability to Plaintiff's pretext argument because Plaintiff does not appear to be arguing that ODRC's legitimate nondiscriminatory basis had "no basis in fact." *See id.*; *see also Gray v. State Farm Mut. Auto. Ins. Co.*, 145 F.4th 630, 650 (6th Cir. 2025) ("The concept applies in a targeted way to a small set of employment disputes").

1 while employed by Defendant as a CNP." (*Id.*)

In her Opposition, Plaintiff argues that "[d]espite the alleged agency wide policy, this practice was commonplace at Marion and Mansfield." (Doc. No. 33, PageID #1385.) She asserts that "[a]t Mansfield, Glass specifically testified that he was allowed to work overtime as a Nurse 1 after he was promoted to a CNP" and that two other Caucasian nurses were allowed overtime. (*Id.*) Plaintiff further argues that she was the only CNP denied overtime even after pointing this out to her supervisor and after she won her grievance. (*Id.* at PageID #1386.) Plaintiff also argues that this policy is pretext. Plaintiff asserts that "[w]hile ODRC purports an alleged 'agency wide policy' against allowing CNPs to work overtime as Nurse 1 positions existed, there has been no policy produced." (*Id.* at PageID #1387.) Plaintiff argues that "[a]t least two prisons, Mansfield and Marion, allowed multiple CNPs . . . to work overtime for Nurse 1 shifts." (*Id.*) Plaintiff further asserts that "Glass even stated this was an established 'past practice.'" (*Id.*)

In its Reply, ODRC argues that "only during COVID-19 were CNPs allowed to work Nurse 1 overtime, a practice that ceased by directive statewide from Defendant's central office." (Doc. No. 36, PageID #1414.) It asserts that "out-of-class overtime for CNPs occurred post-pandemic at merely two of Defendant's twenty-eight institutions (Mansfield and Marion) and prior to Plaintiff becoming a CNP." (*Id.*) According to ODRC, "these were isolated exceptions attributable to lack of compliance and not accepted or expected practice after the pandemic as Plaintiff suggests" and "Mansfield only used a CNP for Nurse 1 overtime solely to avoid mandation of another Nurse 1, not on a voluntary basis like Plaintiff desired." (*Id.* at PageID #1414–15.) ODRC further argues that "Plaintiff, who at all times relevant herein was administratively a Richland employee, even when splitting her time between Mansfield and Richland, challenged not being able to work Nurse 1

overtime at Richland, not Mansfield or Marion." (*Id.* at PageID #1415.) ODRC argues that "Plaintiff has pointed to no other CNP who was allowed to work overtime as a Nurse 1 at Richland after her arbitration award while she was being denied." (*Id.*)

The Court need not analyze the parties' arguments concerning Plaintiff's prima facie case, because even if she has established a prima facie case, she has not produced any evidence of pretext. Plaintiff does not dispute that ODRC has presented evidence of a legitimate, nondiscriminatory reason for why it denied overtime, namely that "it honestly believed that both the directive issued and the Agreement prevented Plaintiff from working Nurse 1 overtime while employed as a CNP." (Doc. No. 31, PageID #1032.) She asserts that this is pretext because (1) "there has been no policy produced;" (2) "Steward testified that ODRC found that allowing employees with higher classifications to work in lower classifications so helpful that the practice continued well after Covid;" (3) "[a]t least two prisons, Mansfield and Marion, allowed multiple CNPs, including Glass, Newman, and Slone, to work overtime for Nurse 1 shifts;" and (4) "Glass even stated this was an established 'past practice' that alleviated a lot of 'patient trips to the hospital and [saved the] state money.'" (Doc. No. 33, PageID #1387.) These facts, according to Plaintiff, establish that ODRC's proffered reason is "factually inaccurate." (*Id.*)

Plaintiff is correct that no written formal policy in the record. But Rader testified that after recovering from COVID, "our Operations Support Center Pushed out messages to the institutions to cease the practice" of permitting CPNs to work Nurse 1 overtime. (Rader Dep. 68:23–69:1.) In preparing for Plaintiff's grievance hearing, he "found incredibly isolated incidents of CNPs working RN overtime without the agency's knowledge or permission." (*Id.* at 69:7–10.) Some of the isolated incidents occurred at ManCi. (*Id.* at 70:1–22; Elder Dep. 112:21–23.) But there is nothing in the

29

record suggesting that this occurred at Richland. (Shelton Dep. 35:7–12; Elder Dep. 112:15–20.) Indeed, the arbitrator found that of the seventy-five CNPs working across ODRC's twenty-five locations, only three CNPs worked Nurse 1 overtime, and those three CNPs "did so without agency permission." (Doc. No. 23-13, PageID #419.)

When Shelton denied Plaintiff's overtime request at Richland, he was unaware of nurse practitioners working overtime at ManCi. (Shelton Dep. 41:13–19 ("The only ones that I was aware of was Jodie Slone was working at Marion, but I don't know in what capacity").) Instead, he denied the request pursuant to a directive for nurse practitioners to not work RN overtime that he received from his regional nurse administrator:

> Q: All right. And so essentially you followed the process that was put in place by, I assume, your supervisors regarding the interpretation of whether or not Sheila could work overtime. Is that accurate?
>
> A: Correct.
>
> Q: Okay.
>
> A: I just followed directives from my immediate supervisors, so –

(Shelton Dep. 31:16–32:8, 36:11–21.) Plaintiff has not presented evidence establishing that such a directive did not actually exist or that Shelton denied Plaintiff's request for overtime for any improper purpose.

Glass' testimony that "the past practice was that NPs were allowed to RN shifts overtime" does not move the needle in Plaintiff's favor. Glass never testified that ODRC had a statewide "past practice" of permitting CNPs to work Nurse 1 overtime and he did not testify that the "past practice" occurred at Richland. (Glass Dep. 31:15–32:23.) And as explained above, the record reflects that the "past practice" Glass described was confined to ManCi. Plaintiff has simply not produced any

evidence suggesting otherwise.

In sum, the Court finds that ODRC is entitled to summary judgment on Plaintiff's discrimination claims regarding the denial of overtime.  The Court therefore finds that ODRC is entitled to summary judgment on Counts One and Two of the Amended Complaint.

**V.     Conclusion**

For the reasons set forth herein, ODRC's Motion for Summary Judgment (Doc. No. 31) is GRANTED.

**IT IS SO ORDERED.**


      _s/Pamela A. Barker_
      PAMELA A. BARKER
Date:  February 11, 2026      U. S. DISTRICT JUDGE

31